IN THE UNITED STATES DISTRICT COURT   FILED
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ROBERT BROOKING, SUSAN BROOKING, CARRIE LEE ARTHUR, NICOLE SHARRETT, AISSATOU BALDE, AND AHMAD TAHERI GHOMI, *Individually, and behalf of all others similarly situated,* )))))))) | |
| Plaintiffs, ) | |
| v. ) | CIVIL NO.   1:10 cv 1360 |
| ) | TSE/IDD |
| BANK OF AMERICA, N.A., )))))) Serve: CT Corporation System Registered Agent 4701 Cox Road, Suite 301 Glen Allen, VA  23060 | |
| and ) | |
| BAC HOME LOAN SERVICING, LP, )))) 6400 Legacy Drive Plano, TX 75024 | |
| Defendants. )) | |

## CLASS COMPLAINT

COME NOW the Plaintiffs, ROBERT BROOKING, SUSAN BROOKING, CARRIE

LEE ARTHUR, NICOLE SHARRETT, AISSATOU BALDE, and AHMAD TAHERI

GHOMI (collectively "Plaintiffs") by counsel, individually, and on behalf and behalf of

all others similarly situated and for their complaint against the Defendants Bank of

America, N.A.  and BAC Home Loan Servicing, L.P. (collectively "Bank of America" or

"Defendants"), they allege as follows:

### I.    PRELIMINARY STATEMENT

1.    This is an action for actual, statutory and punitive damages, costs and

attorney's fees brought pursuant to the Federal Fair Credit Reporting Act (FCRA) 15 U.S.C. §1681 et seq., (an individual accuracy claim for Plaintiff Sharrett), the Federal Equal Credit Opportunity Act (ECOA), 15 U.S.C. §1681, et seq. (alleged on a class basis for failure to send a lawful denial letter) and the Real Estate and Settlement Procedures Act (RESPA as an individual claim for Plaintiff Sharrett) as well as for state claims of Breach of Contract (alleged on a class basis) (and in the alternative Promissory Estoppel), Fraud and Defamation (as an individual claim for Plaintiff Sharrett).

2.     At its simplest, the individual Fair Credit claim in this case alleges that Bank of America inaccurately reported the Plaintiff Sharrett as having defaulted on her mortgage and otherwise having violated her obligations to her creditor. There is no objective basis for Bank of America to have reported this to the credit bureaus. For all of her financial struggles over the last year of her relationship with Bank of America, Ms. Sharrett has paid her mortgage and honored her obligations in the manner that Bank of America had insisted.

3.     When Ms. Sharrett learned that Bank of America had inaccurately reported her as in default, and that such inaccuracies had destroyed her credit, she began a dispute process, through the national credit bureaus. Bank of America then refused to investigate or correct its defamatory reporting. In doing so, it violated both the FCRA and the RESPA.

4.     Robert Brooking, Susan Brooking, Carrie Lee Arthur, Nicole Sharrett, Aissatou Balde and Ahmad Taherei Ghomi (collectively "Plaintiffs") also bring this suit on behalf of themselves individually, and a class of similarly situated Virginia residents

2

to challenge the failure of Defendant Bank of America to honor its agreements with borrowers to modify mortgages and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP").

5.    Plaintiffs' allegations are simple – when a mortgage lender promises (in writing even) to modify an eligible loan to prevent impending default, homeowners who live up to their end of the bargain have a right to expect that promise to be kept. This is especially true when the financial institution is acting under the aegis of a federal program that is specifically targeted at preventing foreclosure and to which it agreed when receiving a huge taxpayer funded bailout.

6.    In 2008, Bank of America accepted $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. On April 17, 2009, Steve R. Bailey, Sr. Vice President of Bank of America signed a contract with the U.S. Treasury (attached as Exhibit 1 and included by reference) agreeing to participate in HAMP -- a program in which Bank of America received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

7.    As a participating servicer in HAMP, Bank of America has, in turn, entered into written agreements with consumers for temporary trial modifications. Consumers like the Plaintiffs have complied with these agreements by submitting the required documentation and making payments. Despite such efforts, Defendant Bank of America has ignored its contractual obligations to modify their loans permanently.

8.    Importantly, it is this "Consumer with Bank of America, Bank of America

with Consumer" direct contract that the Plaintiffs seeks to enforce rather than the "Bank of America to U.S. Government, U.S. Government to Bank of America" agreement. The former is a simple common law contract to which the consumer is a party, while in the latter, they are only a third party.

## II.    Jurisdiction and Venue

9.      This Court has federal question jurisdiction under the FCRA, 15 U.S.C. §1681p, and the ECOA, 15 U.S.C. §1691e and RESPA, 12 U.S.C. § 2605(f), 28 U.S.C. §1331.

10.     This court also has jurisdiction over the state law claims by supplemental jurisdiction 28 U.S.C. §1367, and by diversity, 28 U.S.C. §1332.  The parties – the Plaintiffs with the putative class versus the Defendant – are residents of different states.

11.     Further, this putative class action is properly brought before this court pursuant to 28 U.S.C. § 1332(d) in that the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and all members of the class – alleged to be over 100 Virginia consumers - are citizens of a State different from the Defendant.

12.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District and Division, Defendant regularly conducts business in here, and several of the named Plaintiffs reside here.  Further, at least one related and similar action against Bank of America is filed here.

## III.   The Parties

4

13.     The Plaintiff, ROBERT BROOKING ("Mr. Brooking"), is a natural person and resident of the State of Virginia.  Plaintiff is a "consumer" and "person" protected by the ECOA.

14.     The Plaintiff, SUSAN BROOKING ("Mrs. Brooking"), is a natural person and resident of the State of Virginia.  Plaintiff is a "consumer" and "person" protected by the ECOA.

15.     The Plaintiff, CARRIE LEE ARTHUR ("Mrs. Arthur"), formally known as Carrie Lee, is a natural person and resident of the State of Virginia.  Plaintiff is a "consumer" and "person" protected by the ECOA.

16.     The Plaintiff, NICOLE SHARRETT ("Ms. Sharrett"), is a natural person and resident of the State of Virginia.  Ms. Sharrett is a "consumer" and "person" protected by the FCRA, ECOA and RESPA.

17.     The Plaintiff, AISSATOU BALDE ("Ms. Balde"), is a natural person and resident of the State of Virginia.  Ms. Balde is a "consumer" and "person" protected by the ECOA.

18.     The Plaintiff, AHMAD TAHERI GHOMI ("Mr. Ghomi"), is a natural person and resident of the State of Virginia.  Mr. Ghomi is a "consumer" and "person" protected by the ECOA.

19.     Upon information and belief, BANK OF AMERICA, N.A., is a National Bank doing business as a mortgage originator and at all times relevant hereto was a "furnisher" as governed by the FCRA and a "creditor" as governed by the ECOA.

20.     Bank of America, N.A. is the entity that contracted with the United States

6

Department of Treasury as alleged below.  It is also the entity that contracted and issued the trial plans for Plaintiff Ahmad Taheri Ghomi.

21.    Upon information and belief, BAC HOME LOAN SERVICING, LP was and is a wholly owned subsidiary of Bank of America, N.A. created and operated with shared management and control as the servicing agent for Bank of America, N.A.  Upon information and belief the Plaintiff alleges that BAC Home Servicing, L.P. is also a servicer under RESPA and at all times relevant hereto was a "furnisher" as governed by the FCRA and a "creditor" as governed by the ECOA.

22.    BAC Home Servicing, L.P. is the entity that contracted and issued the trial plans for Plaintiffs Robert and Susan Brooking, Carrie Lee Arthur (formerly known as Carrie Lee), Nicole Sharrett an Aissatou Balde.

23.    For all factual and legal purposes relevant to this complaint, both Defendants operated as a single mortgage lending and servicing entity.  It has shared ownership, shared management and represented to the public and the Plaintiffs that they were one and the same.

24.    Upon information and belief, Equifax is a "consumer reporting agency", as defined in 15 U.S.C. §1681(f).  Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. §1681(d) to third parties.

25.    Upon information and belief, Equifax disburses such consumer reports to third parties under contract for monetary compensation.

7

26.    Upon information and belief, Experian is a "consumer reporting agency", as defined in 15 U.S.C. §1681(f). Upon information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. §1681(d) to third parties.

27.    Upon information and belief, Experian disburses such consumer reports to third parties under contract for monetary compensation.

28.    Upon information and belief, Trans Union is a "consumer reporting agency", as defined in 15 U.S.C. §1681(f). Upon information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. §1681(d) to third parties.

29.    Upon information and belief, Trans Union disburses such consumer reports to third parties under contract for monetary compensation.

## IV.   FACTUAL BACKGROUND

### A.    The Foreclosure Crisis

30.    Over the last three years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default[1]. Virginia reported 17,669 properties with foreclosure filings for the second quarter of 2010, the 11th highest activity level in the nation. The

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report at 3. Available at http://cop.senate.gov/reports/library/report-100909-cop.cfm.

8

latest total represents a 22 percent increase from the first quarter of the year and nearly

15 percent above the level reporting for the second quarter of 2009[2].

31.     Increased foreclosures have a detrimental effect not just on the borrowers

who lose unique property and face homelessness, but also on the surrounding

neighborhoods that suffer decreased property values and municipalities that lose tax

revenue.

### B.     Creation of the Home Affordable Modification Program

32.     Motivated in significant part by such concerns, Congress passed the

Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with

the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together,

the "Act"). 12 U.S.C.A. §5201 et. seq. (2009).

33.     The purpose of the Act is to grant the Secretary of the Treasury the

authority to restore liquidity and stability to the financial system, and ensure that such

authority is used in a manner that "protects home values" and "preserves

homeownership."12 U.S.C.A. §5201.

34.     The Act established the Troubled Asset Relief Program, or TARP. 12 U.S.C.

§ 5211. In exercising its authority to administer TARP, the Act mandated that the

Secretary of Treasury take into consideration the "need to help families keep their

homes and to stabilize communities." 12 U.S.C. § 5213(3).   It further mandated that the

Secretary "shall implement a plan that seeks to maximize assistance for homeowners"

---

[2]  www.realtytrac.com/ContentManagement/Library.aspx?ChannelID=13&ItemID=9600

9

and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures" and to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." 12 U.S.C.A. §5219.

35.     On February 18, 2009, the Treasury Secretary and the Director of the Federal Housing Finance Agency created a uniform loan modification protocol, previously identified as HAMP, the program that is at issue in this case.

36.     HAMP is funded by the federal government, primarily with TARP funds. In the last two years, the Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

37.     Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification.

### C.     Bank of America's Broken Promises Under HAMP

38.     The mortgage industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. Bank of America is a servicer and its actions described herein were made as agents for the entities that hold mortgage loans.

39.     Should a servicer elect to participate in HAMP, they execute a Servicer

10

Participation Agreement ("SPA") with the federal government[3]. On April 17, 2009 Steve

R. Bailey, Sr. Vice President of Bank of America, NA, executed an SPA, thereby making

Bank of America, N.A. a participating servicer in HAMP. A copy of this SPA is attached

hereto as Exhibit 1.

40.     The SPA executed by Bank of America incorporates all "guidelines,"

"procedures," and "supplemental documentation, instructions, bulletins, frequently

asked questions, letters, directives, or other communications" issued by the Treasury,

Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.

These documents together are known as the "Program Documentation" (SPA 1.A.), and

are incorporated by reference herein.

41.     The SPA mandates that a Participating Servicer "shall perform" the

activities described in the Program Documentation "for all mortgage loans it services."

(SPA 1.A., 2.A.)[4]

42.     A HAMP Modification consists of two stages. First, a Participating Servicer

is required to gather information and, if appropriate, offer the homeowner a Trial Period

Plan[5]. The Trial Period Plan defines a three-month period in which the homeowner

---

[3] Certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae"), Federal
Home Loan Mortgage Corporation ("Freddie Mac") or companies that accepted money under the TARP program are
subject to mandatory inclusion in HAMP. Otherwise, participation by servicers in the HAMP program is voluntary.

[4] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit
2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV
Overview," attached hereto as Exhibit 3) and Supplemental Documentation—Frequently Asked Questions
("HAMPFAQS," attached hereto as Exhibit 4) and Supplemental Directive 09-08 ("SD 09-08," attached hereto as
Exhibit 5). These documents together describe the basic activities required under HAMP and are incorporated by
reference in both of the TPP Agreements signed by Plaintiff.
[5] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the
modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2. Generally speaking, the goal of a

10

11

makes mortgage payments based on a formula that uses the initial financial information provided.

43.     Bank of America offers Trial Period Plans to eligible homeowners by way of a Trial Period Plan Agreement, which describes the homeowner's duties and obligations under the plan and contractually promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

44.     If the homeowner executes the Trial Period Plan Agreement, complies with objective documentation requirements and makes all three Trial Period Contract monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

45.     There is no lender or servicer discretion involved or permitted.   Once the servicer/lender contracts a Trial Period Plan, the consumer will be entitled to a permanent modification so long as they produce the defined set of documents required to verify the facts previously stated and also comply with the plan payment requirements during the Trial Period Plan.  Further, the terms of that permanent modification are also non-discretionary and are objectively determinable for each consumer based on the "waterfall" analysis required under the HAMP program.

46.     Bank of America has routinely failed to live up to its end of Trial Period Plan Agreements and to offer permanent modifications to homeowners. In March 2010,

---

HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

12

the U.S. Treasury reported that Bank of America had 1,085,894 HAMP-eligible loans in its portfolio. Of these loans, just 32,900 resulted in permanent modifications (approximately 3 %) even though many more homeowners had made the payments and submitted the documentation required by their Trial Period Plan Agreement. The Treasury Report is attached hereto as Exhibit 6.

47.    By failing to live up to the Trial Period Plan Agreements and convert them into permanent loan modifications, Bank of America is not only leaving homeowners in limbo and stressful anxiety, wondering if their home can be saved, Bank of America is also preventing homeowners from pursuing other avenues of resolution, including obtaining alternate lending or using the money they are putting toward Trial Period Plan payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default or reducing the harm from it.

## D.    **HAMP Credit Reporting Guidelines**

48.    In addition to various program procedures created to instruct Bank of America and other servicers on creation and implementation of trial plans and permanent modifications, the program created very specific requirements and a protocol to govern credit reporting for HAMP consumers.

49.    The Fannie Mae Servicing Guide, Part VII, Section 107: "Notifying Credit Repositories", which governed Bank of America in these regards, requires that a servicer continue to report a "full-file" status report (describing the exact status of each mortgage loan it is servicing as of the last business day of each month) to the four major credit

13

repositories for each loan under the HAMP and to do so in accordance with the Fair

Credit Reporting Act and credit bureau requirements established through the Consumer

Data Industry Association (the "CDIA").

50.    The CDIA 2010 Mortgage & Home Equity Reporting Guidelines, attached

hereto as Exhibit 7, define the industry standard for "accuracy" and in relevant part state

verbatim:

### Reporting Guidelines for Trial Period:

The guidelines below should be followed when reporting payments during the
trial period:

1. *Current, but facing imminent default or Current, but eligible for loan
modification.*

If the consumer was current with payments prior to the trial period, and
they make each month's payment on time, report the consumer as current
(Account Status 11) during the trial period. If the consumer is at least 30
days past due during the trial period, report the Account Status Code that
reflects the appropriate level of delinquency.

Special Comment Code 'AC' (Paying under a partial or modified payment
agreement) should also be reported.

Note: Effective November 2010, the verbiage for Special Comment Code
'AC' will be "Paying under a partial payment agreement".

2. *Delinquent.*

If the consumer was delinquent (at least 30 days past the due date) prior
to the trial period and the reduced payments do not bring the account
current, report the Account Status Code that reflects the appropriate level
of delinquency.

Special Comment Code 'AC' (Paying under a partial or modified payment
agreement) should also be reported.

Note: Effective November 2010, the verbiage for Special Comment Code

14

'AC' will be "Paying under a partial payment agreement".

51.     Summarized simply – the CDIA credit-reporting standards require that a consumer who is not yet in default when they enter into a Trial Period Plan Agreement is not to be reported as delinquent or in default thereafter. "If the consumer was current with payments prior to the trial period, and they make each month's payment on time, report the consumer as current ... during the trial period."

### E.     **Factual Allegations as to Robert and Susan Brooking**

52.     Mr. Brooking received a parcel of land in from his father in Ruckersville, VA through inheritance. In 2001, Mr. and Mrs. Brooking began to build a home on the land.

53.     In June 2007, Mr. and Mrs. Brooking took out a $298,000.00 mortgage loan with Archwood Mortgage, LLC, which was acquired by Countrywide Home Loans to finance additional construction on their home.

54.     Sometime thereafter, Bank of America acquired the portfolio of Countrywide and the servicing of Mr. and Mrs. Brooking's mortgage was transferred to Bank of America.

55.     Mr. and Mrs. Brooking consistently paid their monthly mortgage of $2138.09 on time.

56.     In March 2008, Mr. Brooking lost his job as a service manager for a local homebuilder. Mr. Brooking worked odd jobs, but was only able to earn about 50% of his prior income. Mrs. Brooking worked as a medical transcriptionist. At that time, she was also pregnant with their second child.

### 1.     **Mr. and Mrs. Brooking Enter HAMP through Bank of America**

14

15

57.     Mr. and Mrs. Brooking missed their first mortgage payment in October of 2008. They relied on the financial support of family to help them bring their loan current as of January 2009.

58.     Mr. and Mrs. Brooking contacted Bank of America for assistance, but were told that they did not qualify for any assistance because their account was current.

59.     Mr. and Mrs. Brooking struggled to pay as much of the monthly mortgage payment as they could afford through July 2009.

60.     Mr. and Mrs. Brooking continued to contact Bank of America to discuss their hardship and in July 2009, received an application for a Home Affordable Modification Program (HAMP) loan modification.

61.     On or about July 2009, Mr. and Mrs. Brooking forwarded their completed application to Bank of America with the requested documentation including the signed Bank of America Request for Modification Affidavit, income verification documents and the required signed 4506-T Request for Tax Return form to be considered for the HAMP.

62.     On or about August 1, 2009, Bank of America forwarded to Mr. and Mrs. Brooking a document entitled "Home Affordable Modification Trial Period Plan (Step One of Two Step Documentation Process)", which stated that the plan was effective on September 1, 2009 and would run from September 2009 through November 2009. Mr. and Mrs. Brooking's monthly mortgage payments were reduced to the amount of $1,530.78. Mr. and Mrs. Brooking signed the form along with another 4506-T Request for Transcript of Tax Form and forwarded all of the required documentation back to Bank of America

16

prior to the September 1, 2009 deadline indicated on the correspondence. Attached as Exhibit 8 is a copy of Mr. and Mrs. Brooking's Home Affordable Modification Trial Period Plan.

63.     This Trial Period Plan Agreement was entitled "Home Affordable Modification Trial Period Plan," and the first sentence of the agreement provides: "If I am in compliance with this Trial Period Plan and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." Section 3 of the Trial Period Contract Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

64.     The Trial Period Plan Agreement further provides in Section 2 that the Loan Modification Agreement will be effective on "the first day of the month following the month in which the last Trial Period Payment is due," and that "TIME IS OF THE ESSENCE."

65.     Mr. and Mrs. Brooking paid their Trial Period payment for the months of September, October, and November.

### 2.     Bank of America Fails to Follow HAMP

66.     On or about November 30, 2009, having already received the three Trial Period payments, Bank of America requested "missing required documents" (that were submitted with the original application) no later than December 10, 2009.

16

17

67.    Mr. and Mrs. Brooking immediately logged into the Bank of America website

to check their account status. The Bank of America website stated that Mr. and Mrs.

Brooking's current workout status was "Loan Modification" and the workout stage was

"Approved" as of November 19, 2009.

68.    The website also stated:

> **Your loan modification has been approved** and all collections activities
> have been suspended as a result of this approval. Next steps will include a call
> from a workout negotiator who will explain the terms and options of your
> approved workout including all conditions required for the final completion of
> the workout, such as upfront funds. **You will also receive a package of
> documents in the mail. These documents are time sensitive and must
> be signed, notarized and returned to us in 10 days,** including any
> required any upfront funds. If you have not received your workout package
> and/or a phone call from your negotiator by 01/18/2010, please contact us.
> Please do not call before 01/18/2010 as that may delay the process. Please
> respond promptly to any calls or requests that you may receive from Home
> Retention Department during this time period. Lack of response will cause your
> workout to be delayed or cancelled. Thank you. (emphasis added)

69.    On or about December 3, 2009, Mr. and Mrs. Brooking forwarded the alleged

"missing required documents," a cover letter and the website print out via facsimile and

FedEx.

70.    On or about December 4, 2009, Bank of America forwarded correspondence

to Mr. and Mrs. Brooking that stated:

> Thank you for making you trial period mortgage payments as part of the
> federal government's Home Affordable Modification Program. Your trial
> period has expired, and we have determined that, while you have made all
> required payments, as of the trial period expiration date some of your required
> documents for us to complete your loan modification are incomplete or have
> not been provided to us.
>
> We want to help you stay in your home, so we are offering you a one-time trial
> period extension through December 31, 2009. The extension is being offered to

18

> give you additional time to provide us with all of the required documentation
> and information to qualify you for a permanent modification. During this
> extension, you must continue to made additional monthly trial period mortgage
> payments.

A copy of the December 4, 2009 letter from Bank of America is attached as Exhibit 9.

71.    Mr. and Mrs. Brooking called Bank of America and spoke with a representative (Employee ID 3904) who was unable to provide any explanation for the December 4, 2009 letter except that it was an "underwriting issue," but advised Mr. and Mrs. Brooking to continue to make their Trial Period Plan payments.

72.    Mr. and Mrs. Brooking paid the December Trial Period Plan payment.

73.    On December 10, 2009, Mr. and Mrs. Brooking logged into the Bank of America website to check their account status. The Bank of America website indicated that the documents that Mr. and Mrs. Brooking sent by fax and FedEx had been received. The Bank of America website continued to state that Mr. and Mrs. Brooking's current workout status was "Loan Modification" and the workout stage was "Approved" as of November 19, 2009. However, the website also indicated that there was "more than one workout plan associated with this account."

74.    Mr. and Mrs. Brooking made their January Trial Period Plan payment.

75.    Bank of America forwarded correspondence to Mr. and Mrs. Brooking dated January 23, 2010 requesting Mr. and Mrs. Brooking's "remaining trial period payments" or they were "at risk of losing your eligibility for a permanent Home Affordable Modification." The correspondence states:

> You started your Trial Period Modification on September 1, 2009. A trial
> period payment was due that month and each month thereafter. To date,

19

> we have received 4 trial period payment(s) out of 5, including the trial
> period payment due on January 1, 2010.

A copy of the January 23, 2010 letter from Bank of America is attached as Exhibit 10.

76.    Mr. and Mrs. Brooking immediately called a Bank of America representative
to clear up any discrepancy. At that time they spoke with Crystal and Lisa, who advised
them to continue to make their Trial Period Plan payments. Mr. and Mrs. Brooking were
advised that the permanent modification was still being processed and that Bank of America
was "behind on paperwork."

77.    Mr. and Mrs. Brooking did not receive any permanent modification
paperwork in January.

78.    In accordance with the instructions from Bank of America, Mr. and Mrs.
Brooking continued to make their Trial Period Plan payments for the months of February,
March, April and May.

79.    Mr. and Mrs. Brooking continued to call Bank of America to check on the
status of their permanent HAMP modification, but were advised not to worry and they
were just "behind on paperwork."

80.    Bank of America forwarded correspondence to Mr. and Mrs. Brooking
dated March 5, 2010 with an "Important Message About Your Loan." This
correspondence states that it is in response to Mr. and Mrs. Brooking's November 24,
2009 correspondence. It also states that Mr. and Mrs. Brooking's "request for
assistance, along with [their] personal financial information, has been received."

81.    Mr. and Mrs. Brooking made numerous contacts with Bank of America during

20

the months of April and May with regard to the status of their HAMP modification.

82.     Bank of America forwarded correspondence to Mr. and Mrs. Brooking dated May 21, 2010, which stated that, their "loan is not eligible for a Home Affordable Modification..." A copy of the May 21, 2010 letter from Bank of America is attached as Exhibit 11.

83.     The reason for the denial was:

**Trial Plan Default**. Your loan is not eligible for a Home Affordable Modification because you did not make all of the required Trial Period Plan payments by the end of the trial period.

### 3.     Bank of America Forecloses on Mr. and Mrs. Brooking's Home

84.     In correspondence dated June 1, 2010, Bank of America sent to Mr. and Mrs. Brooking a document titled "Notice of Intent to Accelerate." Bank of America asserted that Mr. and Mrs. Brooking were in "serious" default because they had failed to pay the required installments and that the total amount past due on her loan was now $16,227.65.

85.     On or about July 1, 2010, Mr. and Mrs. Brooking received correspondence from Bank of America with an "Important Message About Your Loan." This correspondence states that "[Bank of America] is unable to offer you a workout plan at this time because: Loan submitted to Home Retention Department for a Workout Option. Upon review, the Borrower does not qualify for any Workout Option."

86.     Mr. and Mrs. Brooking continued to contact Bank of America to explore options to avoid foreclosure. They spoke with Bank of America representatives Kayla, Racquel and Deamarcus, but were advised that their only option was a short sale.

21

87.    Bank of America foreclosed on Mr. and Mrs. Brooking's home on August 25, 2010.

88.    On September 9, 2010, Mr. and Mrs. Brooking received correspondence indicating: "**YOU MUST VACATE THE ABOVE PREMISES IMMEDIATELY**."

89.    On September 12, 2010, Mr. and Mrs. Brooking left their home. Their family was forced to split up. Mr. Brooking is now living with his parents. Mrs. Brooking and her sons are living with her sister.

### F.    **Factual Allegations as to Carrie Lee Arthur**

90.    Mrs. Arthur (formally known as Carrie Lee) purchased her home on Rockford School Road, in Hurt, Virginia in July 2007.

91.    At the time of the purchase, Mrs. Arthur took out a $130,000.00 mortgage loan with Countrywide Home Loans.

92.    Sometime thereafter, Bank of America acquired the portfolio of Countrywide and the servicing of Mrs. Arthur's mortgage was transferred to Bank of America.

93.    Mrs. Arthur consistently paid her monthly mortgage of $1113.40 on time.

94.    In October 2009, Mrs. Arthur lost her job as a licensed practical nurse and separated from her husband.  After being out of work for one month, Mrs. Arthur was able to find another job in the healthcare industry, but her hourly rate decreased and her hours were reduced.

#### 1.    **Mrs. Arthur Enters HAMP through Bank of America**

95.    Mrs. Arthur contacted Bank of America to discuss her hardship and requested a 30-day extension so she would not get behind on her monthly payment obligation. The

21

22

Bank of America representative informed her that she may be eligible for the Home Affordable Mortgage Program (HAMP).

96.     During that telephone call, the Bank of America "pre-qualified" Mrs. Arthur for HAMP. The representative advised Mrs. Arthur that she would receive the application in the mail.

97.     In November 2009, Mrs. Arthur received her application for a HAMP loan modification.

98.     One week later, Mrs. Arthur forwarded her completed application to Bank of America with the requested documentation including the signed Bank of America Request for Modification Affidavit, income verification documents and the required signed 4506-T Request for Tax Return form to be considered for the HAMP.

99.     Mrs. Arthur called Bank of America once a week after submitting her completed HAMP application to confirm receipt of the completed application and check on the status. Mrs. Arthur was advised that her application was complete and her application was being processed.

100.     Every week for the next six weeks, Mrs. Arthur called Bank of America to check on the status of her HAMP application.

101.     On or about February 1, 2010, Bank of America forwarded to Mrs. Arthur a document entitled "Home Affordable Modification Trial Period Plan (Step One of Two Step Documentation Process)", which stated that the plan was effective on March 1, 2010 and would run from March 2010 through June 2010.  Mrs. Arthur's monthly mortgage payments were reduced to the amount of $402.799.  Mrs. Arthur signed the form along

23

with another 4506-T Request for Transcript of Tax Form and forwarded all of the required documentation back to Bank of America prior to the March 1, 2010 deadline indicated on the correspondence. Attached as Exhibit 12 is a copy of Mrs. Arthur's Home Affordable Modification Trial Period Plan.

102.    This Trial Period Plan Agreement was entitled "Home Affordable Modification Trial Period Plan," and the first sentence of the agreement provides: "If I am in compliance with this Trial Period Plan and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." Section 3 of the Trial Period Contract Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

103.    The Trial Period Plan Agreement further provides in Section 2 that the Loan Modification Agreement will be effective on "the first day of the month following the month in which the last Trial Period Payment is due," and that "TIME IS OF THE ESSENCE."

104.    The last page of the Trial Period Plan Agreement provided Mrs. Arthur with "Four-Month Trial Period Mortgage Payment Coupons." In bold it stated, **"These payments should be sent instead of, not in addition to, your normal monthly mortgage payment."**

105.    Mrs. Arthur paid their Trial Period payment for the months of March, April,

23

24

May and June pursuant to the Trial Period Plan.

### 2.   Bank of America Fails to Follow HAMP

106.   On or about March 11, 2010, having already received one Trial Period payment, Bank of America requested "missing required documents" (that were submitted with the original application) no later than April 10, 2010.

107.   On or about March 20, 2010, Mrs. Arthur forwarded the alleged "missing required documents" via facsimile and first class mail.

108.   Mrs. Arthur called Bank of America and spoke with a representative who confirmed that Mrs. Arthur had submitted all the required documentation and was "under review" for a permanent HAMP modification.

109.   Unlike payments made pursuant to Mrs. Arthur's loan agreement with Bank of America, and even though they instructed Mrs. Arthur to make the Trial Period payments in lieu of her monthly mortgage payment, Bank of America did not apply these payments to reduce, even in part, the balance on Mrs. Arthur's loan, but rather placed said payments in an escrow account.

110.   Once she completed her fourth Trial Period Plan payment, Mrs. Arthur called Bank of America to check on the status of her permanent HAMP modification. She was informed by a representative that it was "still under review" and to continue to make the Trial Period Plan payments during this time.

111.   Mrs. Arthur made her July Trial Period Plan payment in accordance with Bank of America's instructions.

112.   On July 21, 2010, Bank of America forwarded correspondence to Mrs.

24

25

Arthur which stated that her "loan is not eligible for a Home Affordable Modification..."

A copy of the July 21, 2010 letter from Bank of America is attached as Exhibit 13.

113.    The reason for the denial was:

**Ineligible Borrower.** Your loan is not eligible for the Home Affordable Modification because your current monthly housing expense, which includes the monthly principal and interest payment on your mortgage plus property taxes, hazard insurance and homeowner's dues is less than or equal to 31% of your gross monthly income which we verified as $3,953.54. Your housing expense must be greater than 31% of your gross monthly income to be eligible for a Home Affordable Modification.

114.    Mrs. Arthur immediately called Bank of America and spoke with a representative who told Mrs. Arthur that her income was listed at $3,953.54 a month, which was not accurate. Mrs. Arthur was able to have the representative review her pay stubs, who confirmed that her income was listed incorrectly in the system.

115.    The representative told Mrs. Arthur that she needed to file an appeal because they used "incorrect information." The representative agreed to file the appeal over the phone for Mrs. Arthur. While it is under appeal, Mrs. Arthur was told to continue to make her Trial Period Plan payment.

116.    Mrs. Arthur made her August Trial Period Plan payment in accordance with Bank of America's instructions.

117.    Mrs. Arthur continued to make numerous contacts with Bank of America during the months of August and September with regard to the status of her HAMP modification.

### 3.    Bank of America Threatens Foreclose on Mrs. Arthur's Home

26

118.    In correspondence dated September 15, 2010, Bank of America sent to Mrs. Arthur a document titled "Notice of Intent to Accelerate." Despite their representations otherwise, Bank of America asserted that Mrs. Arthur was in "serious" default because she had failed to pay the required installments and that the total amount past due on her loan was now approximately $8,600.

119.    Mrs. Arthur immediately called Bank of America and requested to speak with a supervisor. After several transfers, Mrs. Arthur spoke with a representative named Elizabeth (Extension 9456). Elizabeth requested two more recent pay stubs from Mrs. Arthur and advised her continue to make her Trial Period Plan payment. Elizabeth advised Mrs. Arthur that she would "escalate" her appeal and call her back in two days.

120.    Mrs. Arthur faxed her most recent pay stubs and called Bank of America three days later because she had not heard from Elizabeth. Mrs. Arthur was not allowed to speak to Elizabeth, and instead was transferred to another supervisor, named Desiree. Again, Desiree requested two more recent pay stubs from Mrs. Arthur and advised her continue to make her Trial Period Plan payment. Desiree, again, advised Mrs. Arthur that she would "escalate" her appeal and call her back in two days.

121.    Desiree did not call back Mrs. Arthur. Instead, Mrs. Arthur called back and was told that while her permanent HAMP modification was under appeal, her home would be foreclosed on if she did not pay the entire balance due.

122.    On October, 22, 2010, Mrs. Arthur received correspondence from the Law Offices of Shapiro & Burson, LLP, who threatened to foreclose on her home.

123.    Mrs. Arthur was able to gather the $10,092.67 from family so that she could

27

reinstate the loan and keep her home. That figure included foreclosure costs and late charges for the months that Mrs. Arthur was making Trial Period Plan payments.

### G.   **Factual Allegations as to Nicole Sharrett**

124.   Ms. Sharrett purchased her home on Inspiration Terrace in Aldie, Virginia in September 2006.

125.   At the time of the purchase, Ms. Sharrett took out a $334,000.00 mortgage loan with Countrywide Home Loans. Countrywide only required Ms. Sharrett put $3,000.00 down. The loan was a negative-amortizing, payment-option adjustable rate mortgage ("ARM").

126.   Sometime thereafter, Bank of America acquired the portfolio of Countrywide and the servicing of the Plaintiff's mortgage was transferred to Bank of America.

127.   Ms. Sharrett consistently paid her monthly mortgage of $2231.00 on time.

128.   In 2009, Ms. Sharrett experienced some health setbacks, which increased her medical expenses on a monthly basis. At that same time, Ms. Sharrett was laid off from her job as a human resources representative and had to pay additional medical expenses out of pocket.

### 1.   **Nicole Sharrett Enters HAMP through Bank of America**

129.   Ms. Sharrett contacted Bank of America to discuss her hardship and received an application for a Home Affordable Mortgage Program (HAMP) loan modification.

130.   On or about September 2009, Ms. Sharrett forwarded her completed application to Bank of America with the requested documentation including the signed

28

Bank of America Request for Modification Affidavit, income verification documents and the required signed 4506-T Request for Tax Return form to be considered for the HAMP.

131. On or about January 15, 2010, Bank of America forwarded to Ms. Sharrett a document entitled "Home Affordable Modification Trial Period Plan (Step One of Two Step Documentation Process)", which stated that the plan was effective on February 1, 2010 and would run from February 2010 through May 2010. Ms. Sharrett's monthly mortgage payments were reduced to the amount of $1,334.00. Ms. Sharrett signed the form along with another 4506-T Request for Transcript of Tax Form and forwarded all of the required documentation back to Bank of America prior to the February 1, 2010 deadline indicated on the correspondence. Attached as Exhibit 14 is a copy of the Ms. Sharrett's Home Affordable Modification Trial Period Plan.

132. This Trial Period Plan Agreement was entitled "Home Affordable Modification Program Loan Trial Period," and the first sentence of the agreement provides: "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." Section 3 of the Trial Period Contract Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

133. The Trial Period Plan Agreement further provides in Section 2 that the Loan Modification Agreement will be effective on "the first day of the month following

29

the month in which the last Trial Period Payment is due," and that "TIME IS OF THE
ESSENCE."

134.   At that time (January 2010), Ms. Sharrett had never been late on any of her
payments for any credit accounts or mortgages.

135.   Ms. Sharrett paid her Trial Period payment for the months of February,
March, and April.

## 2.   Bank of America Fails to Follow HAMP

136.   On or about April 11, 2010, having already received the three Trial Period
payments, Bank of America requested "missing required documents" (that were submitted
with the original application) no later than April 13, 2010.

137.   On or about April 14, 2010, Ms. Sharrett forwarded the alleged "missing
required documents" via facsimile and FedEx. On April 15, 2010, Ms. Sharrett verified by
telephone with a Bank of America representative that the "missing required documents"
were received by facsimile. During that same conversation, Ms. Sharrett was instructed to
continue to make her Trial Period payments.

138.   In accordance with the instructions from Bank of America, Ms. Sharrett made
her May, June and July Trial Period payments.

139.   Unlike payments made pursuant to Ms. Sharrett 's loan agreement with
Bank of America, Bank of America did not apply these payments to reduce, even in part,
the balance on Ms. Sharrett 's loan, but rather placed said payments in an escrow
account.

140.   On or about July 1, 2010, Ms. Sharrett received another request from Bank

30

of America for "missing required documents" that need to be returned by July 6, 2010. The "missing required documents" were the same documents that were requested in Bank of America's April correspondence.

141.    On or about July 6, 2010, Ms. Sharrett again sent all the "missing required documents" via facsimile and FedEx.

142.    Bank of America forwarded correspondence to Ms. Sharrett dated July 8, 2010 with an "Important Message About Your Loan." This correspondence states that Ms. Sharrett's "request for assistance, along with [her] personal financial information, has been received."  A copy of the July 8, 2010 letter from Bank of America is attached as Exhibit 15.

143.    The correspondence dated July 8, 2010 also stated as follows:

We do appreciate your patience in allowing us this time to review your loan for possible modification. You will be contacted once we have the results of our analysis.

In the meantime, your loan will remain in normal servicing, and you are still required to make your monthly payments. Your monthly payment is due on the 1st of each month, in accordance with your Note.

144.    Previously, in correspondence from Bank of America dated, June 29, 2010, Ms. Sharrett received her monthly mortgage statement for the first time since signing the HAMP Trial Period agreement. Included with her monthly mortgage statement for July was an "Important message about [her] Home Affordable Modification Trial Period Plan." It stated the following:

"You are currently participating in a Home Affordable Trial Period Plan. During this Trial Period, you may make your monthly payments at the Trial Period monthly payment amount, which is $1,334.00, instead of the amount

31

shown on this statement.

You will continue to receive monthly statements during your Trial Period Plan that will show the payment amount based on your original home loan agreement as your original loan remains in effect and unchanged during the trial period. You will be notified once we have determined your eligibility for a permanent loan modification."

145. Ms. Sharrett made numerous contacts with Bank of America during the months of June and July with regard to the status of her HAMP modification.

146. At this time, Ms. Sharrett had learned that Bank of America was reporting to the credit bureaus that her loan was in default.

147. Bank of America forwarded correspondence to Ms. Sharrett dated July 20, 2010 which stated that her "loan is not eligible for a Home Affordable Modification..." A copy of the July 20, 2010 letter from Bank of America is attached as Exhibit 16.

148. The reason for the denial was:

**Request Incomplete**. [Her] loan is not eligible for a Home Affordable Modification because you did not provide us with the documents we requested. A notice which listed the specific documents we needed and the time frame required to provide them was sent to you more than 30 days ago. We may have also sent you additional notices about missing or incomplete documents.

149. Ms. Sharrett immediately called Bank of America and spoke with a representative named, Dinello, who told Ms. Sharrett that her loan was still under review for a permanent HAMP modification and to continue making her Trial Period payments.

150. Ms. Sharrett made her August Trial Period payment pursuant to her conversation with Bank of America.

### 3.    Bank of America Threatens Foreclosure

32

151.   In correspondence dated, August 26, 2010, Bank of America sent Ms. Sharrett another notice indicating "[they] have reviewed [her] financial information to identify any additional modification options and unfortunately, your loan is not eligible for a modification."

152.   Scared, confused and afraid, Ms. Sharrett made a full, unmodified mortgage payment for the month of September.

153.   Out of nowhere, in correspondence dated August 30, 2010, Bank of America sent to Ms. Sharrett a document titled "Notice of Intent to Accelerate." Bank of America asserted that Ms. Sharrett was in "serious" default because she had failed to pay the required installments and that the total amount past due on her loan was now $5,172.40. This claim was false, as Ms. Sharrett had made all of her requested payments on time.

154.   On or about September 15, 2010, Ms. Sharrett received correspondence from Bank of America that "[they] have received the last installment due under [their] Special Forbearance agreement, dated January 29, 2010." Ms. Sharrett is unaware of any such agreement.

155.   On September 27, 2010, Ms. Sharrett called Bank of America and spoke with a representative named Victoria. During that call, Ms. Sharrett was advised of the following:

- her account is past due for three payments;
- her account is under active HAMP review by Sherry Garrett, but was removed from consideration because she failed to provide "missing required documents"; and
- she should make her full October payment of $2231.00.

156.   During that telephone conversation, Ms. Sharrett advised Victoria that she

33

had timely submitted her "missing required documents." When Victoria checked the Bank of America database, it did in fact indicate that Ms. Sharrett submitted all required documentation. Victoria also indicated that she shouldn't have been denied and she would request that Ms. Sharrett be reconsidered for a *HAMP* modification.

### 4. Bank of America Unlawfully Reports Ms. Sharrett as Delinquent

157.    By this point, Bank of America had been reporting to the Credit Reporting Agencies that Ms. Sharrett's mortgage account had been delinquent since May 2010 and that she had been 90+ days late on her mortgage since September 2010 and for each month thereafter.  Bank of America was further reporting that she had a past due balance on her mortgage of over $6,000.00.

158.    The Bank of America reporting was inaccurate.  Ms. Sharrett has never been 90+ days late on her mortgage at any time, nor is she over $6,000.00 delinquent.

159.    Ms. Sharrett disputed the Bank of America mortgage account through the national consumer reporting agencies in September 2010.

160.    On or about September 27, 2010, Equifax's Results of Investigation mailed to Ms. Sharrett advised that Bank of America's reporting that the mortgage account was delinquent had been verified by the creditor.

161.    On or about September 29, 2010, Trans Union's Investigation Results mailed to Ms. Sharrett advised that it was reporting new information for the Bank of America mortgage account.  The Bank of America mortgage account had been verified as 90 days past due, with a past due balance of $6,694.

34

162.   On information and belief, Bank of America received, but ignored the Ms. Sharrett's disputes and refused to correct and delete the inaccurate information regarding the derogatory account from the Ms. Sharrett's credit files.

163.   Throughout the entire trial period, Bank of America failed to report the Ms. Sharrett's account accurately and in the manner prescribed by the CDIA guidelines.  Her loan was current when it entered the plan and was to be reported current after she entered the plan.

164.   Bank of America had actual knowledge of these inaccuracies and deliberately chose to cause the reporting of the derogatory accounts.

165.   After one or more of the Ms. Sharrett's disputes were forwarded by the credit bureaus to Bank of America, Equifax, Experian and Trans Union prepared and published to third parties multiple inaccurate consumer reports about Ms. Sharrett that contained and republished the inaccurate derogatory Bank of America mortgage tradeline.

166.   Upon information and belief, on one or more occasions, Equifax, Experian and Trans Union forwarded Ms. Sharrett's dispute of the delinquency to Bank of America. Upon information and belief, Bank of America was provided notice of Ms. Sharrett's dispute and despite this notice, failed and refused to investigate and correct its inaccurate reporting.

### 5.   Impact on Ms. Sharrett from Wrongful Credit Reporting

167.   As a result of the actions of Bank of America in wrongfully reporting her as delinquent as described above and the actions of Equifax, Experian and Trans Union in publishing those inaccurate reports without due investigation or care, Ms. Sharrett has

35

suffered the following damages:  denial of credit due to the inaccurate reporting, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

### H.    Factual Allegations as to Aissatou Balde

168.    Ms. Balde refinanced her home with the address of 4317 Amblewood Road, Alexandria, Virginia 22309.

169.    At the time of the refinance, Ms. Balde took out a $322,000.00 mortgage adjustable rate loan with CTX Mortgage Company, LLC (hereinafter "CTX.")  The loan had an initial "teaser" rate that Ms. Balde could afford.

170.    Upon information and belief, sometime thereafter, Countrywide Home Loans acquired the mortgage loan.  Subsequently, Bank of America acquired the portfolio of Countrywide and the servicing of the Ms. Balde's mortgage was transferred to Bank of America.

171.    Ms. Balde consistently paid her monthly mortgage of $1,816.67 on time until she began to experience financial hardship.

172.    Ms. Balde is a home day care provider through the Fairfax County Head Start Program that is self-employed. In 2009, due to the down turn in the economy, her clients chose to remove their children from day care. As a result, Ms. Balde went from caring for five children to just three and suffered a significant decrease in her monthly revenue. Additionally the poor economy caused her husband's employer, a newspaper factory, to let many of its workers go, including Ms. Balde's husband. Ms. Balde used her credit card to pay her increased monthly expenses and was unable to pay the debt back each month.

36

173.   On September 30, 2009, Ms. Balde received a Notice indicating that "[b]ecause your home loan is delinquent, it has been referred to BAC Home Loans Servicing, LP's Foreclosure Management Committee to review." It further stated that "You may be eligible to take advantage of one of the workout or other options described below which may stop the foreclosure process" (emphasis in original) and "[w]e want to help you keep your home. Please call us today."

### 1.    Ms. Balde Enters HAMP through Bank of America

174.   In response to the letter, Ms. Balde contacted Bank of America to discuss her hardship and received an application for a Home Affordable Mortgage Program (HAMP) loan modification.

175.   On or about October 1, 2009, Ms. Balde forwarded her completed application to Bank of America with the requested documentation including the signed Bank of America Request for Modification Affidavit, income verification documents and the required signed 4506-T Request for Tax Return form to be considered for HAMP.

176.   Bank of America forwarded correspondence to Ms. Balde dated December 5, 2009 that was "About [Her] Loan." This stated, "We recently received your inquiry pertaining to payment assistance."

177.   On December 16, 2009, Ms. Balde and her housing counselor called Bank of America and received an automated recording that stated "[her] loan modification was approved and is assigned to a workout negotiator and collections activity have stopped." The recording indicated she should receive the time sensitive documents in the mail soon.

37

178.   Again, Bank of America forwarded correspondence to Ms. Balde dated December 31, 2009 that was "About [Her] Loan." This stated, "We recently received your inquiry pertaining to payment assistance."

179.   On January 24, 2010, Ms. Balde's housing counselor called to check on the status of the HAMP application. The housing counselor spoke with a Bank of America representative named, Gary (Employee ID#1879), who indicated her HAMP application was still under review. The housing counselor inquired about the previous approval but Gary did not know anything about that.

180.   On or about February 8, 2010, Bank of America forwarded to Ms. Balde a document entitled "Home Affordable Modification Trial Period Plan (Step One of Two Step Documentation Process)", which stated that the plan was effective on March 1, 2010 and would run from March 2010 through May 2010. Ms. Balde's monthly mortgage payments were reduced to the amount of $1,509.70. Ms. Balde signed the form along with another 4506-T Request for Transcript of Tax Form and forwarded all of the required documentation back to Bank of America prior to the March 1, 2010 deadline indicated on the correspondence. Attached as Exhibit 17 is a copy of Ms. Balde's Home Affordable Modification Trial Period Plan.

181.   This Trial Period Plan Agreement was entitled "Home Affordable Modification Program Loan Trial Period," and the first sentence of the agreement provides: "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the

38

Mortgage on the Property, and (2) the Note secured by the Mortgage." Section 3 of the Trial Period Contract Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

182. The Trial Period Plan Agreement further provides in Section 2 that the Loan Modification Agreement will be effective on "the first day of the month following the month in which the last Trial Period Payment is due," and that "TIME IS OF THE ESSENCE."

183. Ms. Balde paid her first Trial Period payment prior to the March 1, 2010 deadline.

## 2. Bank of America Fails to Follow HAMP

184. On or about March 10, 2010, Bank of America thanking Ms. Balde for her participation in HAMP. The letter also stated that "their records indicated [they] are missing some required documents" (that were previously submitted with the original application). The letter requested the missing documents no later than April 9, 2010.

185. On March 24, 2010, Ms. Balde forwarded the alleged "missing documents" via facsimile and FedEx. The documents totaled 68 pages.

186. On or about March 10, 2010, having already received the three Trial Period payments, Bank of America requested "missing required documents" (that were submitted with the original application) no later than April 13, 2010.

187. Ms. Balde made her April Trial Period payment.

188. On or about April 18, 2010, Ms. Balde's housing counselor received a telephone call from an underwriting representative at Bank of America, who requested proof of Ms. Balde's rental income.

39

189.    On April 19, 2010, Ms. Balde's housing counselor left a voice message and sent a letter inquiring as to what specific documentation the underwriter required.

190.    On April 21, 2010, Ms. Balde faxed documentation evidencing her rental income to the Bank of America underwriter.

191.    Ms. Balde made her May Trial Period payment.

192.    On or about May 3, 2010, Ms. Balde received via certified mail, return receipt, a notice of default and acceleration from Recontrust Company, N.A. and Samuel I. White, P.C. The letter stated that her home would be scheduled for a foreclosure sale in fourteen (14) days.

193.    On or about May 6, 2010, Ms. Balde and her housing counselor spoke with James (Employee ID#7531) at Bank of America regarding the notice about the foreclosure sale. They were advised that any sale would be on hold while Ms. Balde is being reviewed for a modification.

194.    On or about May 11, 2010, Ms. Balde received another request from Bank of America for "missing required documents" that need to be returned by May 16, 2010. The "missing required documents" were the same documents that were requested in Bank of America's April correspondence.

195.    The letter also stated (in bold):

As you should be aware, your trial period under the Home Affordable Modification Program expires on May 5, 2010. If we do not receive all of the remaining documentation listed above by May 16, 2010, you will not receive a Home Affordable Modification. You will not be eligible for consideration under this program in the future and we will resume collection activities to bring the account current.

40

196.    Immediately upon receipt of the letter, Ms. Balde faxed the requested "missing required documents" to Bank of America.

197.    Bank of America forwarded correspondence to Ms. Balde dated May 18, 2010 with an "Important Message About Your Loan." This correspondence acknowledged receipt of Ms. Balde's "correspondence received on May 13, 2010." It goes on to state that "Your request for assistance, along with your personal financial information, has been received."

198.    Ms. Balde continued to make her June, July, August and September Trial Period payments.

199.    Ms. Balde and her housing counselor made numerous contacts with Bank of America during the months of June and July with regard to the status of her HAMP modification.

200.    Bank of America forwarded correspondence to Ms. Balde dated September 8, 2010 which stated that her "loan is not eligible for a Home Affordable Modification..." A copy of the September 8, 2010 letter from Bank of America is attached as Exhibit 18.

201.    The reason for the denial was:

**Excessive Forbearance**. [Her] loan is not eligible for a Home Affordable Modification because we are unable to create an affordable payment equal to 31% of your reported monthly gross income without changing the terms of our loan beyond the requirements of the program. In other words, to create an affordable payment for [her], the investor (owner) of your loan would be required to delay collecting too large a portion of your principal balance until the loan pays off, beyond what the Home Affordable Modification Program allows.

202.    Ms. Balde immediately called Bank of America and was advised that their only

41

recourse was to reapply for a HAMP modification and start the process at the beginning.

### 3.   Bank of America Threatens Foreclosure

203.   In correspondence dated September 14, 2010, Bank of America sent to Ms. Balde a document titled "Notice of Intent to Accelerate." Bank of America asserted that the Plaintiff was in "serious" default because she had failed to pay the required installments and that the total amount past due on her loan was now $22,931.53.

204.   On or about September 20, 2010, Ms. Balde submitted the necessary documentation to begin the HAMP process all over again.

### I.   Factual Allegations as to Ahmad Taheri Ghomi

205.   Mr. Ghomi purchased his home on Waterflow Place in Centreville, Virginia in January 2005.

206.   At the time of the purchase, Mr. Ghomi took out a $312,800.00 mortgage loan with Bank of America, N.A.

207.   In May 2008, Mr. Ghomi refinanced his home loan for $336,000, again with Bank of America, N.A. The new loan was a negative-amortizing, payment-option adjustable rate mortgage ("ARM").

208.   Mr. Ghomi consistently paid his monthly mortgage of $2001.25 on time.

209.   In 2009 Mr. Ghomi experienced a 25% reduction in his income due to the difficult economic times. He was having trouble providing for his wife and three children.

### 1.   Mr. Ghomi Enters HAMP through Bank of America

210.   Mr. Ghomi contacted Bank of America to discuss his hardship in February 2009. At that time he was advised that he would need to miss at least three mortgage

42

payments in order to get some sort of loss mitigation assistance.

211.   In May 2009, Mr. Ghomi received an application for a Home Affordable Mortgage Program (HAMP) loan modification

212.   On or about June 2009, Mr. Ghomi forwarded his completed application to Bank of America with the requested documentation including the signed Bank of America Request for Modification Affidavit, income verification documents and the required signed 4506-T Request for Tax Return form to be considered for the HAMP.

213.   On or about July 28, 2009, Bank of America forwarded to Mr. Ghomi a document entitled "Home Affordable Modification Trial Period Plan (Step One of Two Step Documentation Process)", which stated that the plan was effective on August 12, 2009 and would run from August 2009 through October 2009.  The Plaintiff's monthly mortgage payments were reduced to the amount of $1,113.04.  The Plaintiff signed the form along with another 4506-T Request for Transcript of Tax Form and forwarded all of the required documentation back to Bank of America prior to the August 12, 2009 deadline indicated on the correspondence. Attached as Exhibit 19 is a copy of Mr. Ghomi's Home Affordable Modification Trial Period Plan.

214.   This Trial Period Plan Agreement was entitled "Home Affordable Modification Program Loan Trial Period," and the first sentence of the agreement provides: "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by

42

43

the Mortgage." Section 3 of the Trial Period Contract Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

215.    The Trial Period Plan Agreement further provides in Section 2 that the Loan Modification Agreement will be effective on "the first day of the month following the month in which the last Trial Period Payment is due," and that "TIME IS OF THE ESSENCE."

216.    Mr. Ghomi paid his Trial Period payment for the months of August, September, and October per the Trial Period Plan.

## 2.    Bank of America Fails to Follow HAMP

217.    Mr. Ghomi did not receive a permanent HAMP modification at the conclusion of the Trial Period Plan. When Mr. Ghomi called Bank of America to inquire about the status, he was advised to continue to make the Trial Period Plan payments.

218.    Mr. Ghomi made his Trial Period payments for the months of November, December and January.

219.    Bank of America forwarded correspondence to Mr. Ghomi dated January 26, 2010 requesting Mr. Ghomi's "remaining trial period payments" or he was "at risk of losing your eligibility for a permanent Home Affordable Modification." The correspondence states:

> You started your Trial Period Modification on August 1, 2009. A trial period payment was due that month and each month thereafter. To date, we have received **1 trial period payment(s) out of 6**, including the trial period payment due on January 1, 2010. (emphasis added)

220.    Mr. Ghomi immediately called a Bank of America representative to clear up

44

any discrepancy. At that time he spoke with Patrick (Employee ID #2144). Patrick was only able to confirm receipt of his January 2010 Trial Period payment (Check No. 139), which was cashed on January 15, 2010.

221.    Bank of America forwarded correspondence to Mr. Ghomi dated January 29, 2010 requesting Mr. Ghomi's "remaining trial period payments" or he was "at risk of losing your eligibility for a permanent Home Affordable Modification." The correspondence states:

> You started your Trial Period Modification on August 1, 2009. A trial period payment was due that month and each month thereafter. To date, we have received **0 trial period payment(s) out of 6,** including the trial period payment due on January 1, 2010. (emphasis added)

222.    Mr. Ghomi, again, contacted Bank of America and spoke with and Porsha (Employee ID#8013), who could offer no explanation for the discrepancies, but advised him to continue to make his Trial Period Payments.

223.    Mr. Ghomi made his Trial Period payments for the months of February, March, April, May, June, July, and August.

224.    On March 22, 2010, Mr. Ghomi called Bank of America to check on the status of his permanent HAMP modification. He spoke with Jacob (Employee ID#7014), who indicated that he was still under review and to continue to make his Trial Period payments.

225.    On April 26, 2010, again, Mr. Ghomi called Bank of America to check on the status of his permanent HAMP modification. This time he spoke with David (Employee ID#8934), who was unable to provide Mr. Ghomi any new information. On April 30, 2010, he called back and spoke with Nicole, but the status of his permanent modification was unchanged.

44

45

226.   On May 27, 2010, again, Mr. Ghomi called Bank of America to check on the status of his permanent HAMP modification. He spoke with Vicki (Employee ID#3958), who indicated that he was still under review and confirmed receipt of his Trial Period payments.

227.   On June 8, 2010, again, Mr. Ghomi called Bank of America to check on the status of his permanent HAMP modification. He spoke with Renea (Employee ID#7883), his permanent modification was approved. Renea indicated he should receive the paperwork in approximately one week.

228.   Mr. Ghomi did not receive any permanent modification paperwork.

229.   In correspondence from Bank of America dated, June 29, 2010, Mr. Ghomi received his monthly mortgage statement for the first time since signing the HAMP Trial Period agreement. Included with his monthly mortgage statement for July was an "Important message about [her] Home Affordable Modification Trial Period Plan." It stated the following:

"You are currently participating in a Home Affordable Trial Period Plan. During this Trial Period, you may make your monthly payments at the Trial Period monthly payment amount, which is $1,113.04, instead of the amount shown on this statement.

You will continue to receive monthly statements during your Trial Period Plan that will show the payment amount based on your original home loan agreement as your original loan remains in effect and unchanged during the trial period. You will be notified once we have determined your eligibility for a permanent loan modification."

230.   On July 27, 2010, Mr. Ghomi called Bank of America to check on the status of his permanent HAMP modification. He spoke with Dawn (Employee ID#4473), who

46

indicated that he was still under review for a permanent modification.

231.    Bank of America forwarded correspondence to Mr. Ghomi dated August 1, 2010, which stated that, his "loan is not eligible for a Home Affordable Modification..."

232.    The reason for the denial was "failure to make Trial Period payments."

233.    Upon receipt of the denial letter, Mr. Ghomi immediately called Bank of America and spoke with a female representative who indicated he was missing Trial Period payments for several months. Mr. Ghomi provided the representative with the check and confirmation numbers so she could locate the payments he had made. When she was able to locate the payments, she apologized to Mr. Ghomi for any confusion. Out of an abundance of caution, Mr. Ghomi insisted that she confirm all Trial Period payments were made. The representative told Mr. Ghomi that his December 2009 Trial Period payment was missing.

234.    Mr. Ghomi immediately forwarded a check to Bank of America for the December Trial Period payment.

### 3.    Bank of America Threatens Foreclosure

235.    In correspondence dated August 19, 2010, Bank of America sent to Mr. Ghomi a document titled "Notice of Intent to Accelerate." Bank of America asserted that Mr. Ghomi was in "serious" default because she had failed to pay the required payments and that the total amount past due on his loan was now $26,851.33.

236.    Throughout the months of August and September, Mr. Ghomi called Bank of America on a weekly basis to check the status of his modification and confirm receipt of his September Trial Period payment.

237.    Mr. Ghomi made his October Trial Period payment.

46

47

238. In October, Mr. Ghomi continued to appeal to representatives at Bank of America for assistance in order to obtain his permanent HAMP modification.

239. On October 19, 2010, Mr. Ghomi spoke with Eileen Munoz from the Bank of America "executive office." Ms. Munoz indicated that she would send Mr. Ghomi's loan to be reviewed for a modification in lieu of foreclosure.

240. The only obligations on a consumer such as Mr. and Mrs. Brooking, Mrs. Arthur, Ms. Sharrett, Ms. Balde and Mr. Ghomi after the Trial Period Plan Agreement is contracted is as stated in the *HAMP* Servicer checklist: "For Modification Agreement to be executed— Borrowers must successfully complete trial period and return two signed Home Affordable Modification Agreements to the servicer." Home Affordable Modification Program (HAMP): Checklist for Getting Started and Participating in *HAMP*, February 22, 2010, Exhibit 20.

V.     **CAUSES OF ACTION**

**COUNT ONE:  BREACH OF CONTRACT**

**CLASS CLAIM**

241. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

242. **The Contract Class**. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for herself and on behalf of a class (the "Class") initially defined as follows:

> All natural persons who on any date on or after April 17, 2009,
> (a.) with regard to a mortgage loan secured by their personal
> residence (b.) located in the Commonwealth of Virginia and

48

otherwise eligible for application of HAMP, (c.) entered into a written Trial Period Plan Agreement with Bank of America, N.A or BAC Home Loan Servicing, L.P. and thereafter (d.) made their three trial payments as therein required.

Excluded from the class definition are borrowers to whom Bank of America, N.A. or BAC Home Loan Servicing, L.P. sent, prior to the effective date stated in the consumer's Trial Period Plan Agreement, either: (a) a permanent Home Affordable Modification Agreement, or (b) a written denial of eligibility

Also excluded from the class definition are any employees, officers, directors of Bank of America, N.A. or any of its subsidiary or related companies, any attorney appearing in this case, and any judge assigned to hear this action.

243.   **Numerosity. FED. R. CIV. P. 23(a)(1).**  Plaintiffs do not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendants. However, on information and belief, Plaintiffs allege that the class encompasses many hundreds of individuals whose identities can be readily ascertained from Defendants' books and records. Therefore, the proposed class is so numerous that joinder of all members is impracticable.

244.   Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million. In the alternative, Plaintiffs believe the amount in controversy exceeds $5 million based on the equity loss that could result to putative class members if they were to lose their homes to foreclosure as a result of Defendants' failure to convert temporary modifications into permanent modifications.

245.   **Existence and Predominance of Common Questions of Law and Fact. FED. R. CIV. P. 23(a)(2).**  Common questions of law and fact exist as to all members of the Class.  These questions predominate over the questions affecting only

48

49

individual members.  All members of the class have been subject to and affected by the

same conduct. These common legal and factual questions include, among other things

and without limitation:

a.   The review and interpretation of form contracts and uniform loan
     modification processing requirements;

b.   The nature, scope and operation of Defendants' obligations to
     homeowners under HAMP;

c.   Whether Defendants' receipt of an executed Trial Period Plan
     Agreement, along with supporting documentation and three
     monthly payments, creates a binding contract or otherwise legally
     obligates Defendants to offer class members a permanent HAMP
     modification;

d.   Whether Defendants' failure to provide permanent HAMP
     modifications in these circumstances amounts to a breach of
     contract and/or a breach of the covenant of good faith and fair
     dealing; and

e.   Whether the Court can order Defendants to pay damages and what
     the proper measure of damages is, and also whether the Court can
     enter injunctive relief.

246.   **Typicality. FED. R. CIV. P. 23(a)(3)**.  Plaintiffs' claims are typical of the

claims of each Class member for the reasons alleged in the previous paragraph and in

that the Plaintiffs and the other members of the class were subject to the same conduct,

50

signed the same agreement and were met with the same absence of a permanent modification. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the Class.

247. **Adequacy.** Plaintiffs are adequate representatives of the Class because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent, they have retained counsel competent and experienced in such litigation, and they intend to prosecute this action vigorously. FED. R. CIV. P. 23(a(4). Plaintiffs and their Counsel will fairly and adequately protect the interests of members of the Class.

248. **Superiority.** As alleged previously, there are significant questions of law and fact common to the Class members. These predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. FED. R. CIV. P. 23(b)(3). The claims in this case and the circumstances of class members are such that individual prosecution would be extremely unlikely and would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation; it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct. By contrast, the

51

class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

249. **Injunctive Relief Appropriate for the Class.** Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to the Plaintiffs and the Class members. FED. R. CIV. P. 23(b)(2).

250. As described above, the Trial Period Plan Agreements sent by Defendants to the Plaintiffs and class members constituted valid contract offers.

251. By executing the Trial Period Plan Agreements and providing it to Defendants along with the supporting documentation, the Plaintiffs and class members accepted Defendants' offers.

252. Alternatively, the Plaintiffs' and class members' return of the Trial Period Plan Agreements constituted contract offers. Acceptance of these offers occurred when Defendants accepted Trial Period Plan Agreement payments.

253. The Trial Period Plan Agreement payments to Defendants by the Plaintiffs and class members and their compliance with the other terms of such Agreements, all of which actions were requested by Bank of America and none of which were pre-existing legal obligations, constituted consideration. By making those payments, Plaintiffs and each class member gave up the ability to pursue other means of saving their homes, and Defendants received payments it might otherwise not have.

254. As additional consideration, the Plaintiffs and class members provided a

52

large amount of private financial and other information to the Defendant, access to which it would not have otherwise had access.

255.   Plaintiffs and class members and Defendants thereby formed enforceable contracts.

256.   By failing to offer permanent HAMP modifications, Defendants breached its contracts.

257.   In the alternative, Plaintiffs allege that they and each member of the class did reasonably rely upon representations made by Bank of America in and related to the Trial Period Plan Agreement to their determinant and plead that Bank of America be estopped from failing to perform in accordance with these representations.

258.   Plaintiffs and each class member have suffered actual damages and are threatened with additional harm from Defendants' breach. By making Trial Period Plan payments both during and after the Trial Period Contract, Plaintiffs and class members lost other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home. On information and belief, some putative class members have suffered additional harm in the form of foreclosure activity against their homes.

259.   To the extent that actual damages will not fully and fairly compensate each class member, they are also entitled to specific performance and other appropriate injunctive relief.

## COUNT TWO:  VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT

53

## 15 U.S.C. §1691(d) and Virginia Code §59.1-21.21:1

## CLASS CLAIM

260.   Plaintiffs repeat and re-allege every allegation above as if set forth herein

in full.

261.   **The ECOA Class**. Pursuant to Rule 23 of the Federal Rules of Civil

Procedure, Plaintiffs bring this action for herself and on behalf of a class (the "Class")

initially defined as follows:

> All natural persons who on any date on or after April 17,
> 2009, (a.) with regard to a mortgage loan secured by their
> personal residence (b.) located in the Commonwealth of
> Virginia, (c.) provided Bank of America, N.A. or BAC Home
> Loan Servicing, L.P. a completed "Making Home Affordable
> Program Request For Modification and Affidavit" (Exhibit
> 21), and thereafter (d.) were not approved for the
> Modification.

> Excluded from the class definition are any consumers who
> received a written notice from Bank of America, N.A. or BAC
> Home Loan Servicing, L.P. within 30 days of completing a
> HAMP application that provided a statement of reasons for the
> application denial and the additional statutory disclosures
> required under the ECOA.

> Also excluded from the class definition are any employees,
> officers, directors of Bank of America, N.A. or any subsidiary or
> related company, any attorney appearing in this case, and any
> judge assigned to hear this action.

262.   **Numerosity. FED. R. CIV. P. 23(a)(1).**   Plaintiffs do not know the

exact size or identities of the members of the proposed class or sub-class, since such

information is in the exclusive control of Defendant. However, on information and

belief, Plaintiffs allege that they encompass many hundreds of individuals whose

54

identities can be readily ascertained from Defendant's books and records. Therefore, the proposed class or sub-class are so numerous that joinder of all members is impracticable.

263.   **Existence and Predominance of Common Questions of Law and Fact. FED. R. CIV. P. 23(a)(2).**   Common questions of law and fact exist as to all members of the Class or sub-class.   These questions predominate over the questions affecting only individual members.   All members have been subject to and affected by the same conduct. These common legal and factual questions include, among other things and without limitation:

   a.   The review and interpretation of form contracts and uniform loan modification processing requirements;

   b.   Whether Bank of America's rejection of class member applications for HAMP loan modifications constituted adverse actions;

   c.   Whether in their application for the loan modifications consumers were applying for credit under the ECOA;

   d.   Whether it was Bank of America' procedure to fail to send adverse action notice letters that complied with the ECOA; and

   e.   Whether the Court can order Defendants to pay damages and what the proper measure of damages is, and also whether the Court can enter injunctive relief.

264.   **Typicality. FED. R. CIV. P. 23(a)(3)).**   Plaintiffs' claims are typical of the claims of each Class member for the reasons alleged in the previous paragraph and

55

in that the Plaintiffs and the other members were subject to the same conduct, signed the same application and were met with the same absence of a permanent modification. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the Class.

265.   **Adequacy.** Plaintiffs are an adequate representative of the Class because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent, they have retained counsel competent and experienced in such litigation, and she intends to prosecute this action vigorously. FED. R. CIV. P. 23(a)(4). Plaintiffs and their Counsel will fairly and adequately protect the interests of class members.

266.   **Superiority.** As alleged previously, there are significant questions of law and fact common to the Class members. These predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. FED. R. CIV. P. 23(b)(3). The claims in this case and the circumstances of class members are such that individual prosecution would be extremely unlikely and would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for the members of the Class to individually redress effectively the wrongs done to them. Even if the members themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by

56

the complex legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

267. **Injunctive Relief Appropriate for the Class.** Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class or sub-class, making appropriate equitable injunctive relief. FED. R. CIV. P. 23(b)(2).

268. The "Making Home Affordable Program Request For Modification and Affidavit" completed by the Plaintiffs and each putative class member was a completed application for credit. In each instance, the Plaintiffs or other member was asking Bank of America to obtain more favorable credit terms.

269. At all times relevant hereto, it was Bank of America's policy not to send timely notice letters to consumers when it denied their applications as alleged.

270. Bank of America also failed to provide the statutory disclosures required by the ECOA to Plaintiffs and the class members as required under the ECOA.

271. The above-alleged actions and omissions of the Defendant violated the ECOA, 15 U.S.C. §1691(d) and the Virginia Equal Credit Opportunity Act (VECOA), Virginia Code §59.1-21.21:1. The Plaintiff and the putative class are entitled to attorney's fees and costs pursuant to 15 U.S.C. §1691e and Virginia Code § 59.1-21.23.

272. The Defendants are liable to the Plaintiffs and the putative class for punitive damages of $10,000.00 per violation pursuant to Virginia Code § 59.1-21.23. The Defendants' violations were widespread, without legal justification, and greatly

57

impacted class members.  Given the net worth of Bank of America, it is also unlikely that any lesser remedy would adequately deter it from further non-compliance.

273.   The Plaintiffs and the putative class are entitled to declaratory and injunctive relief requiring the Defendants' compliance with the ECOA pursuant to 15 U.S.C. §1691e.

58

## COUNT THREE: VIOLATION OF FAIR CREDIT REPORTING ACT
## 15 U.S.C. §1681s-2(b)
## NICOLE SHARRETT INDIVIDUAL CLAIM

274.   Plaintiff, Nicole Sharrett, repeats and re-alleges every allegation above as if set forth herein in full.

275.   On one or more occasions within the two years prior to the filing of this suit, by example only and without limitation, Bank of America violated the Fair Credit Reporting Act, 15 U.S.C. §1681s-2(1)(A) by failing to fully and properly investigate the Ms. Sharrett's disputes of the Bank of America reporting that were made through Equifax and Trans Union.

276.   On one or more occasions within the two years prior to the filing of this suit, by example only and without limitation, Bank of America violated the Fair Credit Reporting Act, 15 U.S.C. §1681s-2(1)(B) by failing to review all relevant information provided by the consumer reporting agencies upon Ms. Sharrett's disputes.

277.   On one or more occasions within the two years prior to the filing of this suit, by example only and without limitation, Bank of America violated the Fair Credit Reporting Act, 15 U.S.C. §1681s-2b(1)(C) and (D), after Ms. Sharrett's disputes through Equifax, Trans Union and Experian, by publishing the Plaintiff's credit file with TransUnion and Equifax without also including a notation that this debt was disputed and by failing to correctly report results of an accurate investigation to each other credit reporting agency.

278.   As a result of this conduct, action and inaction of Bank of America, Ms. Sharrett suffered actual damages including without limitation, by example only and as

58

59

described herein on Plaintiff's behalf by counsel:  loss of credit, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

279.    Bank of America's conduct, actions and inactions were willful, rendering Bank of America liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.  In the alternative, Bank of America was negligent, entitling the Plaintiff to recover under 15 U.S.C. §1681o.

280.    Ms. Sharrett is entitled to recover actual damages, statutory damages, costs and attorneys fees from Bank of America in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT FOUR: VIOLATION OF REAL ESTATE SETTLEMENT PROCEDURES ACT 12 U.S.C. §2605(e)

### ALL PLAINTIFFS, INDIVIDUAL CLAIM

281.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

282.    On one or more occasions within the two years prior to the filing of this suit, by example only and without limitation, each Plaintiff made multiple qualified written requests to Bank of America insisting that it process their HAMP applications, correct inaccurate credit reporting and/or otherwise provide information regarding their respective loans.

283.    On each occasion alleged in this Complaint, Plaintiffs' written communications were sent to the address at which consumers were instructed to send such communications by Bank of America.

60

284.    On nearly each occasion in which each Plaintiff did make a qualified written requests, Bank of America violated the Real Estate Settlement Procedures Act, 12 U.S.C. §2605(e) by:

a.    Failing to timely or at all provide a written notice of receipt of inquiry;

b.    Failing to timely or at all to conduct an appropriate investigation of inquiry;

c.    Failing to timely or at all to provide a true and correct written explanation or clarification; and

d.    Continuing to report information regarding allegedly overdue payments to the national credit bureaus.

285.    As a result of this conduct, actions and inactions of Bank of America, each Plaintiff suffered actual damages including without limitation, by example only and as described herein on Plaintiffs' behalves by counsel:  denial of credit, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

286.    Bank of America is liable for actual damages in an amount to be determined by the Court pursuant to 15 U.S.C. §2605(f).

287.    As alleged in the Complaint, Bank of America's conduct appears to be a pattern and practice of misconduct with many consumers.  It is certainly so with the numerous violations alleged as to Plaintiffs.  For each violation of 12 U.S.C. §2605(e), Bank of America is thus also liable to each Plaintiff for additional damages up to $1,000 per violation.

288.    Plaintiffs are entitled to recover costs and attorneys fees from Bank of

61

America in an amount to be determined by the Court pursuant to 12 U.S.C. §2605(f)(3).

## VI.   CONCLUSION

WHEREFORE, Plaintiffs respectfully requests the following relief:

a. Certify the ECOA and Contract claims in this case as a class action and appoint the named Plaintiffs to be class representatives and their counsel to be class counsel;

b. Enter a judgment declaring the acts and practices of Defendants complained of herein to constitute a breach of contract, as well as a declaration that they are required to offer permanent modifications to class members on the terms promised in class members' temporary modifications;

c. Grant a permanent or final injunction enjoining Defendants' agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

d. Order Defendants to adopt and enforce a policy that requires appropriate training of its employees and agents regarding their duties under HAMP;

e. Order specific performance of Defendants' contractual obligations together with other relief required by contract and law;

f. Award actual, statutory, and punitive damages as pled;

g. Award Plaintiffs and their counsel attorneys fees and the costs of this action, including the fees and costs of experts;

h. Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.


**TRIAL BY JURY IS DEMANDED**.

62

**ROBERT BROOKING, SUSAN BROOKING, CARRIE LEE ARTHUR, NICOLE SHARRETT, AISSATOU BALDE, AND AHMAD TAHERI GHOMI**

By _____
Of Counsel

Kristi Cahoon Kelly, Esq., VSB #72791
J. Chapman Petersen, Esq., VSB # 37225
Scott A. Surovell, Esq., VSB # 40278
SUROVELL MARKLE ISAACS & LEVY PLC
4010 University Drive, 2nd Floor
Fairfax, VA 22030
Telephone (703) 277-9774
Facsimile (703) 591-9285
kcahoon@smillaw.com

LEONARD A. BENNETT, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 201
Newport News, Virginia 23606
Telephone (757) 930-3660
Facsimile (757) 930-3662
lenbennett@clalegal.com

Matthew J. Erausquin, VSB#65434
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Telephone:  (703) 273-777
Facsimile:  (888) 892-3512
matt@clalegal.com

Dale W. Pittman, VSB#15673
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
(804) 861-6000
(804) 861-3368 (Fax)
dale@pittmanlawoffice.com

*Counsel for Plaintiffs*

62